JEAN STEINBERG, DONOR, PETITIONER *v.* COMMISSIONER
OF INTERNAL REVENUE, RESPONDENT

Docket No. 23865–11.        Filed September 30, 2013.

P entered into a binding gift agreement with her daughters
under which P gave her daughters cash and securities and in
exchange the daughters agreed to assume and to pay, among
other things, any estate tax liability imposed under I.R.C. sec.
2035(b) as a result of the gifts in the event that P passed
away within three years of the gifts. In calculating for gift
tax purposes the gross fair market value of the property
transferred to the daughters, P reduced the fair market value
of the cash and securities by an amount representing the
value of the daughters' assumption of the potential I.R.C. sec.
2035(b) estate tax liability, among other things. *Held*: Because
the value of the obligation assumed by the daughters is not
barred as a matter of law from being consideration in money
or money's worth within the meaning of I.R.C. sec. 2512(b),
the fair market value of P's taxable gift may be determined
with reference to the daughters' assumption of the potential
I.R.C. sec. 2035(b) estate tax liability. We will deny R's motion
for summary judgment, and we will no longer follow *McCord
v. Commissioner*, 120 T.C. 358 (2003), *rev'd and remanded sub
nom. Succession of McCord v. Commissioner*, 461 F.3d 614
(5th Cir. 2006), to the extent it provides otherwise.

*John W. Porter*, *Keri D. Brown*, *Michael S. Arlein*, and *Jeffrey D. Watters, Jr.*, for petitioner.
*John V. Cardone* and *Jane J. Kim*, for respondent.

OPINION

KERRIGAN, *Judge*: This gift tax case is before the Court on respondent's motion for summary judgment filed under Rule 121. Petitioner objects to the motion.

Respondent issued petitioner a notice of deficiency, increasing petitioner's gift tax liability by $1,804,908 for tax year 2007. Regarding the motion for summary judgment, respondent disputes only one issue: whether a donee's promise to pay any Federal or State estate tax liability that may arise under section 2035(b) if the donor dies within three years of the gift may constitute consideration in money or money's worth within the meaning of section 2512(b).

Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the year in issue, and all Rule references are to the Tax Court Rules of Practice and

258

Procedure. We round all monetary amounts to the nearest dollar.

## *Background*

The following facts are not in dispute. Petitioner resided in New York when she filed the petition.

On April 17, 2007, petitioner entered into a binding gift agreement (net gift agreement) with her four adult daughters (collectively, donees). At that time petitioner was 89 years old. In the net gift agreement petitioner agreed to make gifts of cash and securities to the donees. In exchange, the donees agreed to assume and to pay any Federal gift tax liability imposed as a result of the gifts. The donees also agreed to assume and to pay any Federal or State estate tax liability imposed under section 2035(b) as a result of the gifts in the event that petitioner passed away within three years of the gifts. Section 2035(b) provides that the amount of a gross estate shall be increased by the amount of gift taxes paid on any gift made by the decedent during the three-year period preceding the decedent's date of death. Section 3, Federal and State Estate Tax, of the net gift agreement provides in pertinent part:

> a. *Assumption of Federal and State Estate Tax Liability*. Each Donee hereby agrees to assume, pay and indemnify the Executor against all additional federal and state estate tax liability assessed pursuant to Code Section 2035(b) (i) if Mrs. Steinberg [petitioner] does not survive for three years following the Effective Date and (ii) that is directly attributable to Mrs. Steinberg's transfer of the Gift Property made under the Instruments of Transfer, including all penalties and interest which accrue upon such estate tax liability except such penalties and interest that are directly attributable to actions or delays committed by the Executor or another Donee (the *Estate Tax Liability*). For purposes of determining and allocating the Estate Tax Liability, (i) the value of all additional tax shall be as finally determined for federal estate tax purposes, (ii) the only gift tax taken into account in the calculation shall be the gift tax on Mrs. Steinberg's transfers of the Gift Property to the Donees made under the Instruments of Transfer, and (iii) the amount of the Estate Tax Liability each Donee shall bear shall be an amount equal to the Estate Tax Liability attributable to the Donee's Gift Tax Share A and the Donee's Gift Tax Share B (in each case, collectively, the Donee's *Estate Tax Share*).

\*   \*   \*   \*   \*   \*   \*

c. *Payment of Estate Tax Liability*.

i. *Donees' Payment to Executor*. Each Donee shall deliver to the Executor an amount equal to the Donee's Estate Tax Share by certified check made payable to the United States Treasury, no later than thirty days before the due date for payment of the Estate Tax Liability, or, if later, as soon thereafter as the Executor notifies the Donee of the amount of the Estate Tax Liability.

The net gift agreement also provides remedies if any daughter fails to pay her share of any section 2035(b) estate tax liability. Section 7(c), Remedy Available in Event of Default, of the net gift agreement provides in pertinent part:

ii. *Default in Payment of Estate Tax Liability*. If the Executor determines that a Donee is in default * * * the Executor shall give notice to the Donee that the Donee is in default (*Estate Tax Default Notice* and *Estate Tax Default Notice Date*, respectively). If the Donee fails within 10 business days after the Default Notice Date to deliver to the Executor the remaining balance of the Donee's Estate Tax Share of the Estate Tax Liability (*Donee's Estate Tax Balance*), all Cash Distributions [i.e., certain quarterly distributions to which the donees are entitled] otherwise distributable to a Donee shall be delivered directly to the Executor * * *. Each Donee agrees that, upon the date on which the Executor gives an Estate Tax Default Notice to a Donee, the Executor also shall deliver a duplicate copy of the Estate Tax Default Notice to the Manager, and the Donee shall be deemed to have directed the Manager to deliver the Cash Distribution otherwise distributable to the Donee directly to the Executor in satisfaction of the Donee's Estate Tax Balance as provided in this paragraph. Each Donee agrees to perform any and all acts necessary as a shareholder, partner, member, manager or director of any entity governed by an Applicable Agreement to effect the payment of the Donee's Estate Tax Balance to the Executor.

The net gift agreement was the result of several months of negotiation between petitioner and the donees. Petitioner and the donees were represented by separate counsel.

Petitioner retained an appraiser to calculate the gross fair market value of the property transferred to the donees. The appraiser also calculated the aggregate fair market value of the "net gift". The appraiser determined the value of the net gift by reducing the fair market value of the cash and securities by both (1) the gift tax the donees paid and (2) the actuarial value of the donees' assumption of potential section 2035(b) estate tax. The appraiser determined the actuarial value of the donees' assumption of the potential section 2035(b) estate tax by calculating petitioner's annual mortality rate for the three years after the gift (i.e., the prob-

ability that petitioner would pass away within one year, two years, or three years of the gift), among other things. The appraiser determined that the aggregate fair market value of the net gift was $71,598,056, as of the date of the gift. Petitioner valued the donees' assumption of the potential section 2035(b) estate tax liability at $5,838,540.

On October 15, 2008, petitioner timely filed a Form 709, United States Gift (and Generation-Skipping Transfer) Tax Return, for tax year 2007. On the Form 709 petitioner reported taxable gifts of $71,598,056 and total gift tax of $32,034,311. Petitioner attached a summary of the net gift agreement, which included a description of the appraiser's determination of the value of the net gifts, to the Form 709.

On July 25, 2011, respondent mailed the notice of deficiency, which increased the aggregate value of petitioner's net gifts to the donees from $71,598,056 to $75,608,963, for a total gift tax increase of $1,804,908. Respondent disallowed the discount petitioner made for the donees' assumption of the potential section 2035(b) estate tax liability. [1] In response, petitioner filed a petition, and respondent filed a motion for summary judgment.

## *Discussion*

### I. *Summary Judgment*

Summary judgment may be granted where the pleadings and other materials show that there is no genuine dispute as to any material fact and that a decision may be rendered as a matter of law. Rule 121(b); *Sundstrand Corp. v. Commissioner*, 98 T.C. 518, 520 (1992), *aff'd*, 17 F.3d 965 (7th Cir. 1994). The burden is on the moving party (in this case, respondent) to demonstrate that there is no genuine dispute as to any material fact and that he or she is entitled to judgment as a matter of law. *FPL Grp., Inc. & Subs. v. Commissioner*, 116 T.C. 73, 74–75 (2001). In considering a motion for summary judgment, evidence is viewed in the light most favorable to the nonmoving party. *Bond v. Commissioner*,

---

[1] The notice of deficiency increased the value of petitioner's total gifts for tax year 2007 by $4,010,907 because of "net gifts to donor's four daughters". Nonetheless, both respondent and petitioner claim that the notice of deficiency disallowed petitioner's entire $5,838,540 discount for the donees' assumption of the potential sec. 2035(b) estate tax liability.

100 T.C. 32, 36 (1993). The nonmoving party may not rest upon the mere allegations or denials of his or her pleading but must set forth specific facts showing there is a genuine dispute for trial. *Sundstrand Corp. v. Commissioner*, 98 T.C. at 520.

For purposes of respondent's motion, respondent does not dispute (1) the value of the cash and securities transferred; (2) whether petitioner properly reduced her gift tax liability by the amount of gift tax the donees assumed; or (3) whether the donees' assumption of the section 2035(b) estate tax liability is enforceable under local law. Respondent's sole claim is that the donees' assumption of the potential section 2035(b) estate tax liability did not increase the value of petitioner's estate and therefore did not constitute consideration in money or money's worth within the meaning of section 2512(b) in exchange for the gifts. For the following reasons we conclude that there are genuine factual disputes about the issue.

## II. *Statutory Framework*

### A. *Gift Tax Generally*

Section 2501(a) imposes a tax on the transfer of property by gift. The donor is primarily responsible for paying the gift tax. Sec. 2502(c); *see also* sec. 25.2502–2, Gift Tax Regs. The gift tax is imposed upon the donor's act of making the transfer, rather than upon receipt by the donee, and it is measured by the value of the property passing from the donor, rather than the value of enrichment resulting to the donee. Sec. 25.2511–2(a), Gift Tax Regs. Donative intent on the part of the donor is not an essential element for gift tax purposes; the application of gift tax is based on the objective facts and circumstances of the transfer rather than the subjective motives of the donor. Sec. 25.2511–1(g)(1), Gift Tax Regs.

The amount of gift tax is based on the aggregate value of taxable gifts made during the year, among other things. *See* sec. 2502(a) (imposing the gift tax on a cumulative basis). Taxable gifts are the total amount of gifts made during the year, less certain deductions.[2] Sec. 2503(a). The amount of a

---

[2] Sec. 2503 also enumerates a handful of exclusions, none of which are relevant in this case.

gift of property is generally the value of the property on the date of the gift. Sec. 2512(a). The gift is complete when the property has left the donor's dominion and control. *See* sec. 25.2511–2(b), Gift Tax Regs. The value of the property is the price at which it would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of the relevant facts. Sec. 25.2512–1, Gift Tax Regs.

The amount of the gift is the amount by which the value of the property transferred exceeds the value of consideration received in money or money's worth. *See* sec. 2512(b); secs. 25.2511–1(g)(1), 25.2512–8, Gift Tax Regs.; *see also Commissioner v. Wemyss*, 324 U.S. 303, 306–307 (1945). Thus, if a donor makes a gift subject to the condition that the donee pay the resulting gift tax, the amount of the gift is reduced by the amount of the gift tax. *See Harrison v. Commissioner*, 17 T.C. 1350, 1357 (1952). Such a gift is commonly referred to as a "net gift".

B. *Section 2035(b) "Gross-Up" Provision*

Under section 2035(b) (formerly section 2035(c), *see* Taxpayer Relief Act of 1997, Pub. L. No. 105–34, sec. 1310(a), 111 Stat. at 1043), a decedent's gross estate is increased by the amount of any gift tax paid by the decedent or the decedent's estate on any gift made by the decedent during the three-year period preceding the decedent's death. For purposes of this "gross-up" provision, we have deemed that the phrase "gift tax paid by the decedent or the decedent's estate" during the relevant three-year period includes gift tax attributable to a net gift the decedent made during that period (despite the fact that the donee is responsible for paying the gift tax in that situation). *Estate of Sachs v. Commissioner*, 88 T.C. 769, 777–778 (1987), *aff'd in part, rev'd in part on other grounds*, 856 F.2d 1158, 1164 (8th Cir. 1988). We note that the inclusion of the gift tax paid is a computational element only.

Congress enacted what is now section 2035(b) as part of an effort to mitigate the disparity of treatment between the taxation of lifetime transfers and transfers at death. *See* H.R. Rept. No. 94–1380, at 11 (1976), 1976–3 C.B. (Vol. 3) 735,

745.[3] Congress imposed the gross-up provision on gift tax paid within three years of death because "the gift tax paid on a lifetime transfer which is included in a decedent's gross estate is taken into account both as a credit against the estate tax and also as a reduction in the estate tax base, [so] substantial tax savings can be derived under present law by making so-called 'deathbed gifts' even though the transfer is subject to both taxes." *Id.* at 12, 1976–3 C.B. (Vol. 3) at 746. Congress intended the gross-up rule to "eliminate any incentive to make deathbed transfers to remove an amount equal to the gift taxes from the transfer tax base." *Id.*

C. *Net Gifts*

The net gift rationale flows from the basic premise that the gift tax applies to transfers of property only to the extent that the value of the property transferred exceeds the value in money or money's worth of any consideration received in exchange therefor. *See* sec. 2512(b); sec. 25.2512–8, Gift Tax Regs. When a net gift occurs, the donor calculates his or her gift tax liability by reducing the amount of the gift by the amount of the gift tax. *Estate of Morgens v. Commissioner*, 133 T.C. 402, 417 (2009), *aff'd*, 678 F.3d 769 (9th Cir. 2012). The rationale is that "because the donee incurred the obligation to pay the tax as a condition of the gift, 'the donor did not have the intent to make other than a net gift.'" *Id.* (quoting *Turner v. Commissioner*, 49 T.C. 356, 360–361 (1968), *aff'd per curiam*, 410 F.2d 752 (6th Cir. 1969)). In other words the donor reduces the value of the gift by the amount of the tax because the donor has received consideration for a part of the gift equal to the amount of the applicable gift tax. *Id.*

Petitioner's gift may be best described as a "net, net gift" because the donees agreed to pay both the resulting gift tax and any potential section 2035(b) estate tax. We will refer to petitioner's gift in its entirety as a net gift.

---

[3] Before the enactment gifts made within three years of the donor's death were merely presumed to be in contemplation of death. *See* H.R. Rept. No. 94–1380, at 12 (1976), 1976–3 C.B. (Vol. 3) 735, 746. Congress opted for a bright-line test in sec. 2035(b) to end the "considerable litigation concerning the motives of decedents in making gifts." *Id.*

III. *The Value of the Donees' Assumption of the Potential Section 2035(b) Estate Tax*

The fundamental question posed by this case is the fair market value of the property rights transferred under the net gift agreement. Pursuant to section 25.2512–1, Gift Tax Regs., fair market value is the price at which such property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts. All relevant facts and elements of value as of the time of the gift must be considered. Sec. 25.2512–1, Gift Tax Regs. The "willing buyer/willing seller" test is the bedrock of transfer tax valuation. It requires us to determine what property rights are being transferred and on what price a willing buyer and a willing seller would agree for those property rights.

Respondent claims that the donees' assumption of the potential section 2035(b) estate tax is worthless. In particular respondent contends that the donees' assumption provided no benefit (monetary or otherwise) to petitioner other than some peace of mind. Respondent thus claims that the donees' assumption failed to replenish petitioner's estate and therefore failed as consideration for a gift under the "estate depletion" theory of the gift tax. Respondent rests these claims in part on our holding in *McCord v. Commissioner*, 120 T.C. 358 (2003), *rev'd and remanded sub nom. Succession of McCord v. Commissioner*, 461 F.3d 614 (5th Cir. 2006). For the following reasons we conclude that respondent is not entitled to summary judgment with respect to these claims.

A. *Background: Consideration and the Estate Depletion Theory*

As noted above, a donor need only pay gift tax on a transfer to the extent that the value of the property transferred exceeds the value of any consideration in money or money's worth that the donor receives in exchange. To qualify as consideration in money or money's worth, the consideration received must be reducible to value in money or money's worth; consideration consisting of something unquantifiable, such as love and affection or the promise of marriage, is wholly disregarded. Sec. 25.2512–8, Gift Tax

Regs. Similarly, the relinquishment of dower, curtesy, or any other marital right in a spouse's estate is not considered consideration in money or money's worth. *Id.* A transfer made during the ordinary course of business, however, is per se made for consideration in money or money's worth and thus is not subject to gift tax. *See id.*; *see also* sec. 25.2511–1(g)(1), Gift Tax Regs. (gift tax is not applicable to ordinary business transactions).

The estate depletion theory of gift tax can be applied to determine what constitutes consideration in money or money's worth. Under the estate depletion theory, a donor receives consideration in money or money's worth only to the extent that the donor's estate has been replenished. *See Commissioner v. Wemyss*, 324 U.S. at 307–308; 2 Randolph E. Paul, Federal Estate and Gift Taxation, para. 16.14, at 1114–1115 (1942). The Paul treatise, cited twice with approval by the Supreme Court in *Wemyss*, further notes: "The consideration may thus augment * * * [the donor's] estate, give * * * [the donor] a new right or privilege, or discharge him from liability." Paul, *supra*, at 1115. Thus, the benefit to the donor in money or money's worth, rather than the detriment to the donee, determines the existence and amount of any consideration offset in the context of an otherwise gratuitous transfer. *See Commissioner v. Wemyss*, 324 U.S. at 307–308.

B. *McCord v. Commissioner*

Respondent's claims rely heavily on our reasoning and holding in *McCord*. In *McCord* the taxpayers (husband and wife) formed McCord Interests, Ltd., L.L.P. (MIL). The taxpayers were both class A limited partners and class B limited partners in MIL. The taxpayers' four adult sons were class B limited partners and general partners. On formation MIL held stocks, bonds, real estate, oil and gas investments, and other closely held business interests.

On November 20, 1995, the taxpayers assigned their respective class A limited partnership interests in MIL to a charitable organization. On January 12, 1996 (valuation date), the taxpayers entered into an assignment agreement, in which the taxpayers relinquished all dominion and control over their class B limited partnership interests in MIL to

(1) their four sons, (2) four trusts for the benefit of their sons, and (3) two charitable organizations.

Under the terms of the "formula clause" contained in the assignment agreement, the four sons and the four trusts were to receive the portion of the gift interest having an aggregate fair market value of $6,910,933. If the fair market value of the gift interest exceeded $6,910,933, the excess was to be allocated to the two charitable organizations. Importantly, the four sons—individually and as trustees of the four trusts—agreed to be liable for all transfer taxes (Federal gift, estate, and generation-skipping transfer taxes and any resulting State taxes) imposed on the taxpayers as a result of the gifts.

On their Forms 709 for tax year 1996 both taxpayers reduced the gross value amounts of their respective shares of the gifts by the amount of Federal and State gift tax generated by the transfer, which the four sons had agreed to pay as a condition of the gifts. Each taxpayer further reduced that gross value amount by the actuarially determined value of the four sons' contingent obligation to pay any estate tax that would result from the transaction if that taxpayer were to pass away within three years of the valuation date.

The Commissioner determined, among other things, that the taxpayers had improperly reduced their gross value amounts by the actuarial value of the four sons' obligation to pay any potential estate taxes arising from the transactions.

We agreed with the Commissioner in *McCord*, holding that "in advance of the death of a person, no recognized method exists for approximating the burden of the estate tax with a sufficient degree of certitude to be effective for Federal gift tax purposes". *McCord v. Commissioner*, 120 T.C. at 402. We reasoned that the taxpayers' computation of the mortality-adjusted present value of the sons' obligation merely demonstrated that "if one assumes a fixed dollar amount to be paid, contingent on a person of an assumed age not surviving a three-year period, one can use mortality tables and interest assumptions to calculate the amount that * * * an insurance company might demand to bear the risk that the assumed amount has to be paid." *Id.* We further noted that "the dollar amount of a potential liability to pay the 2035 tax is by no means fixed; rather, such amount depends on factors that are subject to change, including estate tax rates and exemption

amounts (not to mention the continued existence of the estate tax itself)." *Id.* (fn. ref. omitted).

We thus concluded that the taxpayers were not entitled to treat the mortality-adjusted present values as consideration received for the gifts. *Id.* at 402–403. To support this proposition, we cited *Robinette v. Helvering*, 318 U.S. 184, 188–189 (1943), which we described as holding that a "donor's reversionary interest, contingent not only on [the] donor outliving [her] 30-year old daughter, but also on the failure of any issue of the daughter to attain the age of 21 years, is disregarded as an offset in determining the value of the gift; actuarial science cannot establish the probability of whether the daughter would marry and have children". *McCord v. Commissioner*, 120 T.C. at 403.

Additionally, we suggested that the taxpayers' reduction of the value of their gift failed under the estate depletion theory. We pointed out that a donee's assumption of gift tax liability resulting from a gift provides a benefit to the donor in money or money's worth that "is readily apparent and ascertainable, since the donor is relieved of an immediate and definite liability to pay such tax." *Id.* We observed that "[i]f that donee further agrees to pay the potential 2035 tax that may result from the gift, then any benefit in money or money's worth from the arrangement arguably would accrue to the benefit of the donor's estate (and the beneficiaries thereof) rather than the donor", and that "[t]he donor in that situation might receive peace of mind, but that is not the type of tangible benefit required to invoke net gift principles." *Id.*

C. *Succession of McCord v. Commissioner*

The taxpayers appealed *McCord* to the Court of Appeals for the Fifth Circuit, resulting in *Succession of McCord v. Commissioner*, 461 F.3d 614. The Court of Appeals reversed and remanded *McCord*, holding, among other things, that there was nothing too speculative about the McCord sons' legally binding assumption of the potential section 2035(b) estate tax[4] at the time of the gift. *Id.* at 629. The Court of Appeals noted:

_____

[4] The taxpayer husband did in fact pass away within three years of the gift. *Succession of McCord v. Commissioner*, 461 F.3d 614, 629 (5th Cir.

> It is axiomatic contract law that a *present obligation* may be, and frequently is, *performable* at a future date. It is also axiomatic that responsibility for the future performance of such a present obligation may be either firmly fixed or conditional, i.e., either absolute or contingent on the occurrence of a future event, a "condition subsequent." And, it is axiomatic that any conditional liability for the future performance of a present obligation is—to a greater or lesser degree—"speculative." The issue here, though, is not whether § 2035's condition subsequent is speculative *vel non*, but whether it is *too* speculative to be applicable, a very elastic yardstick indeed. [*Id.*]

The Court of Appeals reasoned that there are three major types of conditions subsequent along the "speculative continuum": (1) a future event that is absolutely certain to occur, such as the passage of time; (2) a future event that is not absolutely certain to occur but nevertheless may be a "'more . . . certain prophec[y]'"; and (3) a possible, but low-odds, future event, which is undeniably a "'less . . . certain prophec[y]'", such as "[a] reversion of an interest in property if the unmarried and childless life tenant not only survives the transferor, but herself bears children who live to the age of majority and at least one of whom survives the transferor, as in *Robinette v. Helvering*". *Id.*; *see also Ithaca Trust Co. v. United States*, 279 U.S. 151, 155 (1929) ("Like all values * * * [the value of a remainder interest] depends largely on more or less certain prophecies of the future[.]").

The Court of Appeals concluded that in order to determine whether any conditions subsequent inherent in the McCord sons' assumption were too speculative, one would have to identify which factors "a willing buyer would * * * take into consideration in deciding whether it is *too* speculative for him to insist on its being used in reaching a price that the seller is willing to accept." *Succession of McCord v. Commissioner*, 461 F.3d at 629. The Court of Appeals noted that if a condition subsequent is too speculative, then a willing buyer would not insist that a willing seller provide a discount with respect to that condition subsequent. *Id.* at 630.

The Court of Appeals held, as a matter of law: "[A] willing buyer would insist on the willing seller's recognition that * * * the effect of the three-year exposure to § 2035 estate taxes was sufficiently determinable as of the date of the gifts to be taken into account." *Id.* at 631. In particular, the Court

2006), *rev'g McCord v. Commissioner*, 120 T.C. 358 (2003).

of Appeals noted that, even though estate tax rates have changed and likely will change, the estate tax has not been repealed. The Court of Appeals thus concluded: "[T]he transfer tax law and its rates that were in effect when the gifts were made are the ones that a willing buyer would insist on applying in determining whether to insist on, and calculate, a discount for § 2035 estate tax liability." *Id.* at 630.

The Court of Appeals observed that the Commissioner did not object to the taxpayers' arithmetic in calculating the discount for the potential section 2035(b) estate tax liability and that the Commissioner did not dispute (1) the estate and gift tax laws and rates that were so applied, (2) the interest rate used to discount to present value, (3) the ages used for the taxpayers, or (4) the actuarially determined mortality factors used for determining the likelihood of the taxpayers' deaths within three years of the gift. *Id.*

D. *Departure From McCord*

Petitioner contends that *McCord* was decided incorrectly and that the donees' assumption of the potential section 2035(b) estate tax liability is not worthless. We note that this case is not appealable to the Court of Appeals for the Fifth Circuit, so we are not bound to follow the Court of Appeals' decision in *Succession of McCord*. *See Golsen v. Commissioner*, 54 T.C. 742, 757 (1970), *aff'd*, 445 F.2d 985 (10th Cir. 1971). [5]

1. *Whether the Donees' Assumption is "Too Speculative" as a Matter of Law*

a. *Our Reliance on Robinette v. Helvering*

In *McCord* we concluded that the McCord sons' assumption of the taxpayers' potential section 2035(b) estate tax liability was too speculative to be reduced to a monetary value. In particular, we likened the uncertainty in the McCord taxpayers' situation—i.e., the fact that the dollar amount of the potential estate tax liability is not fixed because factors such

---

[5] This case addresses only the issue discussed in section VII of *McCord*, which pertains to the effect of the McCord sons' agreement to pay any sec. 2035(b) estate tax liability incurred by their parents as a result of the McCord gift.

as estate tax rates and exemption amounts are subject to change—to the uncertainty at the heart of *Robinette v. Helvering*, 318 U.S. 184.

In *Robinette* a daughter (at the time childless and unmarried) and her mother set up two trusts. The daughter placed her property in a trust, creating a life estate for herself and a secondary life estate for her mother and stepfather, should she predecease them. The remainder was to go to the daughter's then-unborn issue upon reaching the age of 21; if no issue existed, the property would be distributed via the will of the last surviving life tenant. The mother set up a similar trust, giving herself a life tenancy in the trust property and giving her daughter a secondary life tenancy, should she predecease her daughter. She assigned the remainder to her daughter's issue upon that issue's reaching the age of 21; if no issue existed, the property would be distributed via the will of the last surviving life tenant. The daughter and her mother, as the taxpayers, conceded that the secondary life estates were gifts but argued that the values of the gifts should be reduced by the values of the remainders to the daughter's unborn issue.

The Supreme Court held that the taxpayers could not reduce the values of the gifts by the values of the reversionary remainder interest. *See Robinette v. Helvering*, 318 U.S. at 188–189. The Supreme Court reasoned that there was no recognized method for determining the values of the contingent reversionary remainders, which, in the case of the mother's trust, depended on not only the possibility of the daughter's survivorship, but also on the death of the daughter without issue who failed to reach the age of 21. *Id.* at 188. The Supreme Court noted that the factors to be considered in fixing the values of the contingent remainders on the date of the gifts included: (1) whether the daughter would marry; (2) whether the daughter would have children; and (3) whether those children would reach the age of 21. *Id.* at 189. The Supreme Court concluded: "[W]e have no reason to believe from this record that even the actuarial art could do more than guess at the value here in question." *Id.*

Notably, the Supreme Court juxtaposed the complex contingent reversionary remainders in *Robinette* with a simple reversionary interest in *Smith v. Shaughnessy*, 318 U.S. 176 (1943), the companion case to *Robinette*. In *Smith*

the taxpayer placed stock into a trust and then granted a life estate in the trust to his wife. The taxpayer set up a secondary life estate in the trust for himself should his wife predecease him. The Government conceded that the taxpayer's reversionary interest, contingent on his outliving his wife, should be excluded from the gift as "having value which can be calculated by an actuarial device, and that it is immune from the gift tax." *Smith*, 318 U.S. at 178.

In *Robinette* the Supreme Court drew a distinction between the reversionary interest in *Smith* and the contingent reversionary remainder in *Robinette*, noting:

> Here unlike the Smith case the government does not concede that the reversionary interest of the petitioner should be deducted from the total value. In the Smith case, the grantor had a reversionary interest which depended only upon his surviving his wife, and the government conceded that the value was therefore capable of ascertainment by recognized actuarial methods. In this case, however, the reversionary interest of the grantor depends not alone upon the possibility of survivorship but also upon the death of the daughter without issue who should reach the age of 21 years. The petitioner does not refer us to any recognized method by which it would be possible to determine the value of such a contingent reversionary remainder. * * * [*Robinette v. Helvering*, 318 U.S. at 188.]

Thus, the Supreme Court expressly distinguished a simple contingency based on the possibility of survivorship, which the Court implied is ascertainable by recognized actuarial methods, from the complex contingency based on the possibility of survivorship plus the possibility that the unmarried daughter might die without issue who reach the age of 21 years, which "was highly remote". *Harrison v. Commissioner*, 17 T.C. at 1355 (discussing *Robinette*); *see also Succession of McCord v. Commissioner*, 461 F.3d at 632 n.47.

In this case, as in *McCord*, the contingency in issue is whether petitioner would survive three years after the date of the gift. Like the contingency in *Smith*, this contingency is simple and based on the possibility of survivorship; it is not complex like the contingency in *Robinette*, which depended on multiple occurrences. The event of petitioner's survival three years after the date of the gift is speculative, and whether it is too speculative or highly remote is a factual issue.

b. *Comparison to Murray v. United States and Estate of Armstrong v. United States*

In reaching our conclusion in *McCord*, we also considered *Murray v. United States*, 687 F.2d 386 (Ct. Cl. 1982), and *Armstrong Trust v. United States*, 132 F. Supp. 2d 421 (W.D. Va. 2001), *aff'd sub nom. Estate of Armstrong v. United States*, 277 F.3d 490 (4th Cir. 2002). *See McCord v. Commissioner*, 120 T.C. at 400–402. We noted that neither case was binding on us and that the facts of both cases were "somewhat different" from the facts in *McCord*. *Id.* at 402. We "agree[d] with what we believe[d] to be the basis of those two opinions, i.e., that, in advance of the death of a person, no recognized method exists for approximating the burden of the estate tax with a sufficient degree of certitude to be effective for Federal gift tax purposes." *Id.* Our reliance on *Murray* and *Estate of Armstrong* is inapposite with respect to the case at hand.

In *Murray*, a donor placed shares of stock into several revocable trusts pursuant to an instrument (dated November 29, 1969) that obligated the trustees to pay, among other debts, the donor's estate and death tax liabilities. The instrument stated that the trusts were revocable "'during the lifetime of the Donor, and prior to January 2, 1970.'" *Murray*, 687 F.2d at 388. The donor passed away on January 2, 1970.

The executors of the donor's estate (the plaintiffs in *Murray*) argued that the obligation to pay the donor's estate and death taxes rendered the gifts completely without value when made. The Court of Claims disagreed, reasoning that although the trusts' obligation to pay the donor's estate and death taxes generally could reduce the value of the gifts, the value of the gifts in this situation was not reducible. *Id.* at 394 (citing *Harrison v. Commissioner*, 17 T.C. at 1354–1355). The Court of Claims further reasoned: "[I]t was not * * * [the donor's] intent to limit the value of the gifts passing in trust to only that amount exceeding the value of the assets necessary to pay [the donor's] estate tax liability. * * * As drafted, the trust agreement does not evidence any clear intention that the entire value of the trust assets were not to be considered as property passing from the donor." *Id.* at 394 n.13.

The Court of Claims concluded that the value of the donor's estate and death taxes was "highly conjectural" at the time of the gift, reasoning that (1) had the donor lived until 1971, the value of his estate would have reduced significantly because the three-year inclusion period under section 2035(b) would have lapsed for a particular gift made in 1968 and (2) for every extra year the donor lived after 1971, the size of his estate would continue to diminish.[6] *Id.* at 394–395.

*Murray* is distinguishable from the case at hand and therefore is not persuasive. Unlike the donor in *Murray*, who did not intend to reduce the value of the gifts by the amount of the estate tax liability, petitioner expressly intended to reduce the value of her gifts by the amount of estate tax liability assumed by the donees. Furthermore, the trusts in *Murray* assumed the donor's entire estate tax liability that was to be paid at an indefinite time in the future, during which the donor's estate could decrease an indefinite amount. The donees in this case, however, assumed only the portion of petitioner's estate tax liability that could be incurred over a three-year span. The value of the amount of section 2035(b) estate tax liability in this case may be predictable.

In *Estate of Armstrong*, a donor made inter vivos gifts of nearly all of his assets to his children. His children expressly declined to assume gift tax liability or potential section 2035(b) estate tax liability with respect to the gifts. After the donor made the gifts, he created an irrevocable grantor trust (donor's trust), from which he (as the sole beneficiary) received income payments. The donor's trust assumed and paid all gift tax liability with respect to the gifts. The children then entered into a transferee liability agreement, in which they agreed to pay any additional gift tax liability resulting from " 'any proposed adjustment to the amount of the * * * gifts.' " *Estate of Armstrong*, 277 F.3d at 493. Although the agreement "appeared to impose on the children the obligation to pay any *additional* gift taxes" if the Internal Revenue Service (IRS) revalued the gifts, the parties actually

---

[6] The Court of Claims also noted that the executors did not present any evidence showing that it was possible to approximate the value of the obligation at the time of the gift. *Murray v. United States*, 687 F.2d 386, 395 (Ct. Cl. 1982).

agreed that the donor's trust would pay any additional gift taxes, while the children would be only secondarily liable. *Id.*

The donor passed away within three years of granting the inter vivos gifts. After the donor's death, the IRS revalued the gifts and increased the gift tax owed. Once again, the donor's trust paid the gift tax owed and the children paid nothing. The IRS also determined that when the executor computed the value of the donor's estate, the executor failed to include the gift tax paid by the donor and the donor's trust with respect to the inter vivos gifts, which resulted in a sizable estate tax deficiency. Because the inter vivos gifts had depleted the estate's assets, the estate was unable to pay the estate tax owed. Under section 6324(a)(2), the IRS assessed the children (as donees of the inter vivos gifts) with the estate tax liability to the extent of the values of the gifts they received. [7] The estate and the donor's trust filed for refund, contending that the children's obligation to pay additional gift and estate taxes as a condition of the gift substantially reduced the values of the gifts and thus the gift taxes owed.

The Court of Appeals for the Fourth Circuit rejected the contentions of the estate and the donor's trust. The estate and the donor's trust claimed that they engaged in a net gift transaction when the children agreed to pay all additional gift taxes. The Court of Appeals distinguished the facts in *Estate of Armstrong*, 277 F.3d at 496, from a typical net gift agreement, in which there is no dispute that the donee is liable for all resulting gift taxes. The Court noted that the children "fully expected and intended * * * that they were protected from 'having to pay taxes and expenses incurred as a result' of the transactions." *Id.* The Court of Appeals reasoned: "Any obligation of the donee to pay gift taxes that is speculative or illusory evidences that the obligation was not a true condition of the gift at the time of transfer". *Id.* at 495. The Court of Appeals concluded that even if the children's obligation was not speculative, the children's agreement to pay additional gift taxes was illusory because the donor's trust paid all of the gift taxes. *Id.* at 496.

---

[7] Presumably, the IRS assessed the children with the estate tax liability only after issuing transferee liability notices, which were petitioned to this Court. *See Armstrong v. Commissioner*, 114 T.C. 94 (2000).

The estate and the donor's trust also contended that the amounts of the gifts should be reduced by "the amount of estate taxes attributable to the gift taxes that the children may be called upon to pay" because they knew at the time of the gift that the donor's estate would be unable to pay the estate tax owed. *Id.* at 497–498. The Court of Appeals disagreed, concluding: "[T]here is no evidence that the children agreed to pay the resulting estate taxes—in the event there were any—as a condition of the stock transfers. Rather, the evidence instead shows that they intended to be protected from any tax liability stemming from the transfers." *Id.* at 498.

*Estate of Armstrong* is distinguishable on its facts from the case at hand and therefore is not persuasive. Unlike the children in *Estate of Armstrong*, the donees in this case expressly agreed to pay both the resulting gift tax liability and any potential section 2035(b) estate tax liability arising from the net gift agreement. Moreover, unlike the *Armstrong* children, the donees in this case engaged in a bona fide net gift agreement.

c. *Fluctuation of Estate Tax Rates and Exemption Amounts*

Finally, we implied in *McCord* that because estate tax rates and exemption amounts are subject to change (and revocation altogether), it would be difficult to determine the amount of the potential section 2035(b) estate tax liability. *See McCord v. Commissioner*, 120 T.C. at 402–403.

The estate tax rate (and the accompanying exemption amounts) is not the only tax rate subject to change. Comparing the estate tax to the capital gains tax, the Court of Appeals for the Fifth Circuit in *Succession of McCord* wrote:

> For purposes of our willing buyer/willing seller analysis, we perceive no distinguishable difference between the nature of the capital gains tax and its rates on the one hand and the nature of the estate tax and its rates on the other hand. Rates and particular features of both the capital gains tax and the estate tax have changed and likely will continue to change with irregular frequency; likewise, despite considerable and repeated outcries and many aborted attempts, neither tax has been repealed. Even though the final amount owed by the Taxpayer as *gift* tax * * * has yet to be finally determined (depending, as it does, on the final results of this case), we are satisfied that the transfer tax law and its rates that were in effect when the gifts were made are the ones that a willing buyer would insist on applying in determining whether to

insist on, and calculate, a discount for § 2035 estate tax liability. [*Succession of McCord v. Commissioner*, 461 F.3d at 630.]

The fact that the estate tax lapsed in 2010 does not undermine the Court of Appeals' reasoning, especially given that the estate tax was reinstated in December 2010, *see* Tax Relief, Unemployment Insurance Reauthorization, and Job Creation Act of 2010, Pub. L. No. 111–312, sec. 101(a)(1), 124 Stat. at 3298, and was extended permanently in 2012, *see* American Taxpayer Relief Act of 2012, Pub. L. No. 112–240, sec. 101(a)(3), (c), 126 Stat. at 2316–2318.

Both capital gains tax rates and estate tax rates have changed since their introduction and are likely to change in the future. Just this year the capital gains tax rates for adjusted net capital gains changed from 15% to 20% for certain high-income individuals. *See* American Taxpayer Relief Act of 2012 sec. 102(b), 126 Stat. at 2318. Yet many courts have held that the fair market value of stock received by gift or bequest must be reduced by capital gains tax, even if there is no indication that the capital gains tax will be triggered by the donee or beneficiary in the near future. *See, e.g.*, *Estate of Jelke v. Commissioner*, 507 F.3d 1317, 1319, 1333 (11th Cir. 2007) (finding that the Tax Court erred by allowing only a partial discount for built-in capital gains tax liability inherent in a bequest of stock instead of allowing a dollar-for-dollar discount of the entire built-in capital gains tax "under the arbitrary assumption that * * * [the underlying corporation] is liquidated on * * * [the date of the bequest]"), *vacating and remanding* T.C. Memo. 2005–131; *Estate of Dunn v. Commissioner*, 301 F.3d 339 (5th Cir. 2002) (finding that when valuing a bequest of stock, a hypothetical willing buyer and willing seller must assume that the underlying corporation has been liquidated on the valuation date, even if an actual liquidation is speculative), *rev'g and remanding* T.C. Memo. 2000–12; *Estate of Jameson v. Commissioner*, 267 F.3d 366 (5th Cir. 2001) (finding that the Tax Court improperly determined only a partial discount for capital gains tax liability inherent in a bequest of stock because the Tax Court failed to use a truly hypothetical willing buyer), *vacating and remanding* T.C. Memo. 1999–43; *Eisenberg v. Commissioner*, 155 F.3d 50 (2d Cir. 1998) (reducing a gift of stock by potential capital gains tax liabil-

ities even though no liquidation or sale of the corporation was planned and finding that potential capital gains tax is not too speculative to be valued because the stock will be subject to capital gains tax on disposition), *vacating and remanding* T.C. Memo. 1997–483. [8] This Court likewise held in *Estate of Davis v. Commissioner*, 110 T.C. 530 (1998), that the value of a gift of stock should be discounted for lack of marketability (attributed to inherent capital gains tax) because a willing buyer and a willing seller would take the built-in capital gains tax into account, even if no liquidation or sale of the underlying assets was contemplated at the time of the gift. These cases show that it is possible to fix the value of built-in capital gains tax on the valuation date, despite (1) fluctuations in the capital gains tax rates; (2) the potential for the capital gains tax to disappear; (3) the fact that there is no indication of when capital gains tax will be triggered by the donee or beneficiary, if ever; and (4) the fact that it is unknown at the time of the gift what actual amount of capital gains tax the donee or beneficiary would pay, if any. [9] We cannot foreclose the possibility that an appropriate

[8] Respondent contends that the Court of Appeals for the Second Circuit, to which an appeal in this case would lie, would find the donees' assumption of petitioner's potential sec. 2035(b) estate tax to be too speculative because of the Court of Appeals' conclusion in *Eisenberg v. Commissioner*, 155 F.3d 50 (2d Cir. 1998), *vacating and remanding* T.C. Memo. 1997–483.

As discussed above, in *Eisenberg* the Court of Appeals for the Second Circuit held that the value of stock in a particular corporation should be reduced by potential capital gains tax liabilities for gift tax purposes, even though no liquidation or sale of the corporation was planned at the time of the gift. *Id.* at 59. The Court of Appeals determined that it was inevitable that the stock would be subject to capital gains tax, so the potential capital gains tax was not too speculative to be valued. *See id.* at 55–56, 58–59.

Respondent claims that because petitioner's potential sec. 2035(b) estate tax liability is not inevitable, the Court of Appeals would hold that it is too speculative to be reduced to a monetary value. We disagree. As discussed in detail above, simply because a contingency is not inevitable does not make the contingency too speculative to be reduced to a monetary value.

[9] Sec. 1(h)(1) imposes tax on a taxpayer's net capital gains for any taxable year. Sec. 1222(11) defines the phrase "net capital gains" as the excess of net long-term capital gain over the net short-term capital loss for the taxable year. Thus, a taxpayer's net capital gains depends on the interplay between the taxpayer's long-term capital gains and losses (which make up net long-term capital gains) as well as the taxpayer's short-term

method likewise may exist to fix the value of the potential section 2035(b) estate tax liability assumed by the donees in this case.

We note that the Court of Appeals for the Fifth Circuit is not alone in considering potential tax liability in valuation cases. In *Estate of Jelke v. Commissioner*, 507 F.3d 1317, the Court of Appeals for the Eleventh Circuit ended a historical overview of discounts for built-in capital gains with a discussion of *Succession of McCord*.[10] *Id.* at 1329. Referring to *Succession of McCord* as part of the "trend" of cases that consider potential tax liability, the Court of Appeals wrote: "The Fifth Circuit [in *Succession of McCord*] thereby extended the rationale of *Estate of Davis* to a gift tax case involving contingent estate taxes." *Id.* at 1329–1330.

Accordingly, we agree with the conclusion of the Court of Appeals for the Fifth Circuit in *Succession of McCord* that a willing buyer and a willing seller in appropriate circumstances may take into account a donee's assumption of potential section 2035(b) estate tax liability in arriving at a sale price.

### 2. *Estate Depletion Theory*

In *McCord* we also suggested that the McCord sons' assumption of the potential section 2035(b) estate tax failed as consideration for a gift under the estate depletion theory. *See McCord v. Commissioner*, 120 T.C. at 403. In particular we pointed out that any benefit in money or money's worth that might arise from a donee's assumption of potential section 2035(b) estate tax "arguably would accrue to the benefit of the donor's estate (and the beneficiaries thereof) rather than the donor." *Id.*

Our distinction between a benefit to the donor's estate and a benefit to the donor was incorrect. For purposes of the

---

capital gains and losses (which make up net short-term capital losses). *See* sec. 1222(6), (8). The actual amount of net capital gain that a donee or beneficiary will have when capital gains tax is actually triggered is therefore difficult to determine at the time of the gift or bequest.

Furthermore, the rate of capital gains tax is based on the taxpayer's taxable income for the tax year, which cannot be precisely determined at the time of gift. *See* sec. 1(h)(1).

[10] The Court of Appeals for the Eleventh Circuit referred to *Succession of McCord* as "*Estate of McCord*".

estate depletion theory, the donor and the donor's estate are inextricably bound. According to the estate depletion theory, whether a *donor* receives consideration is measured by the extent to which the *donor's estate* is replenished by the consideration. *See* Paul, *supra*, at 1115.

A donee's assumption of potential section 2035(b) estate tax liability may provide a tangible benefit to the donor's estate, and therefore as a matter of law it could meet the requirements of the estate depletion theory. Under Federal tax law the cost of any section 2035(b) estate tax liability is generally borne by the donor's estate and not the donee of the gift. *See* secs. 2001, 2002, 2035(b), 2501. When petitioner gave the gifts to the donees, petitioner's assets accrued both gift tax liability and potential section 2035(b) estate tax liability. When the donees assumed the gift tax liability, petitioner's assets were relieved of the gift tax liability and therefore were replenished. Likewise, when the donees assumed the potential section 2035(b) estate tax liability, petitioner's assets may have been relieved of the potential estate tax liability. This assumption, which we have determined may be reducible to a monetary value, also may have replenished petitioner's assets. *See* Paul, *supra*, at 1115 (adequate and full consideration may, among other things, "discharge * * * [the donor] from liability").

Respondent claims that because the entire net gift agreement was a "family type transaction", the donees' assumption of the potential section 2035(b) estate tax liability did not replenish petitioner's estate. To support this claim, respondent compares the situation in this case with that of *Wemyss*.[11]

In *Wemyss* the taxpayer wished to marry a widow. The widow's deceased husband had set up a trust for her on the condition that if she remarried, she would lose all income from the trust. In order to induce the widow to marry, the taxpayer transferred blocks of shares to her. The couple mar-

---

[11] Respondent also attempts to equate the case at hand to *Merrill v. Fahs*, 324 U.S. 308 (1945), a companion case to *Wemyss*, and to *Commissioner v. Bristol*, 121 F.2d 129 (1st Cir. 1941), *vacating and remanding* 42 B.T.A. 263 (1940), a case from the Court of Appeals for the First Circuit and a precursor to *Wemyss*. Both cases dealt with transfers of assets in exchange for the relinquishment of dower and other marital rights. The reasoning and conclusions in both cases are similar to those in *Wemyss*.

ried shortly thereafter. The Supreme Court found that the transfer of shares was a gift. Importantly, the Supreme Court noted that "money consideration must benefit the donor to relieve a transfer by him from being a gift" and that "[t]he section taxing as gifts transfers that are not made for 'adequate and full (money) consideration' aims to reach those transfers which are withdrawn from the donor's estate." *Commissioner v. Wemyss*, 324 U.S. at 307.

Unlike the taxpayer in *Wemyss*, petitioner may have received consideration—the donees' assumption of the potential section 2035(b) estate tax liability, among other things, in exchange for gifts of cash and securities—that is not expressly excluded or otherwise disregarded from consideration by the applicable regulations. Today, section 25.2512–8, Gift Tax Regs., expressly excludes the relinquishment of dower, curtesy, or any other marital right in a spouse's estate from consideration. [12] It also expressly disregards consideration consisting of a promise of marriage, which was at the heart of *Wemyss*, *see, e.g.*, *Estate of D'Ambrosio v. Commissioner*, 101 F.3d 309, 315 (3d Cir. 1996) (describing *Wemyss* as determining that a "promise of marriage [is] insufficient consideration, for gift tax purposes, for tax-free transfer of property"), *rev'g and remanding*, 105 T.C. 252 (1995), because a promise of marriage is unquantifiable and therefore not reducible to monetary value.

Respondent's comparison of the case at hand to *Wemyss* thus falls flat. The donees' assumption of potential section 2035(b) estate tax liability may be quantifiable and reducible to monetary value.

### E. *Conclusion*

Respondent has failed to show as a matter of law that the donees' assumption of petitioner's potential section 2035(b) estate tax liability cannot be consideration in money or money's worth within the meaning of section 2512(b).

---

[12] When *Wemyss* was decided, the Revenue Act of 1932, ch. 209, 47 Stat. 169, expressly excluded the relinquishment of dower and marital rights from consideration in money or money's worth for estate tax purposes. *See Merrill*, 324 U.S. at 313. The Supreme Court in *Merrill* concluded that the exclusion applied to the gift tax as well because the gift tax and estate tax are "in pari materia" (i.e., they must be construed together). *Id.* at 311, 313.

IV. *Donees' Assumption as Outside the Ordinary Course of Business*

Transactions within a family group are subject to special scrutiny, and the presumption is that a transfer between family members is a gift. *Harwood v. Commissioner*, 82 T.C. 239, 258 (1984), *aff'd without published opinion*, 786 F.2d 1174 (9th Cir. 1986). Respondent contends that the donees' assumption of the potential section 2035(b) estate tax liability was itself a gift because (1) the net gift agreement was between family members, and (2) the net gift agreement was not in the ordinary course of business. Respondent further claims that no part of the net gift agreement, presumably including the donees' assumptions of the gift tax liability and the potential section 2035(b) estate tax liability, was "bona fide, at arm's length, and free from any donative intent".

Respondent's claim that a transfer between family members is necessarily a gift unless it was in the ordinary course of business is erroneous. A transfer between family members that is not in the ordinary course of business may still avoid gift tax to the extent it is made for consideration in money or money's worth. Pursuant to section 25.2512–8, Gift Tax Regs., a transfer made in the ordinary course of business is necessarily a transfer made for consideration; [13] however, not all transfers made for consideration are made in the ordinary course of business. Section 25.2511–1(g)(1), Gift Tax Regs., distinguishes the two: "The gift tax is not applicable to a transfer for a full and adequate consideration in money or money's worth, *or to ordinary business transactions*". (Emphasis added.) Thus, a transfer not in the ordinary course of business may still avoid gift tax to the extent it is made for full and adequate consideration, regardless of whether the transfer was between family members.

Additionally, respondent's argument is undermined by respondent's concession that the donees' assumption of gift tax is not subject to gift tax. *See also* Rev. Rul. 75–72, 1975–

---

[13] "[A] sale, exchange, or other transfer of property made in the ordinary course of business (a transaction which is bona fide, at arm's length, and free from any donative intent), will be considered as made for an adequate and full consideration in money or money's worth." Sec. 25.2512–8, Gift Tax Regs.

1 C.B. 310 (providing an algebraic formula for determining the amount of gift tax owed on a net gift). The donees' assumption of gift tax was between family members and was not made in the ordinary course of business, but respondent concedes that it was consideration in money or money's worth given in exchange for petitioner's gifts.

We further note that nothing in the record indicates that the net gift agreement was not bona fide or made at arm's length. Petitioner and the donees were represented by separate counsel, and the net gift agreement was the culmination of months of negotiation.

## V. *Conclusion*

There are genuine disputes of material fact as to whether the donees' assumption of petitioner's potential section 2035(b) estate tax liability constituted consideration in money or money's worth. Respondent is not entitled to summary judgment on this issue.

*An appropriate order will be issued*.

Reviewed by the Court.

COLVIN, FOLEY, VASQUEZ, WHERRY, HOLMES, PARIS, and BUCH, *JJ* ., agree with this opinion of the Court.

GALE, GOEKE, KROUPA, GUSTAFSON, MORRISON, and LAUBER, *JJ*., concur in the result only.

———————————

GOEKE, *J.*, concurring: I agree with Judge Lauber's concurring opinion and write separately only to point out a foreseeable valuation issue that may result from the strategy in this case at the time of a donor's death.

The Code is clear that "[t]he value of the gross estate of the decedent shall be determined by including * * * the value at the time of his death of all property, real or personal, tangible or intangible, wherever situated." Sec. 2031(a). Petitioner recognized that the donor's legal right to have the donees pay any section 2035(b) estate tax liability is a new asset of the donor that must be included in her gross estate like any other contract right, indemnity right, or similar claim she owned at death. Petitioner's position presumes the value of this obligation at death is the same as the

calculated value at the time the asset is created. This presumption is illogical.

The estate tax liability, and therefore the indemnity right, is going to depend on the facts and circumstances. If the donor dies after three years have passed since the date of the gift transaction, then the value of that "new asset" will be zero (i.e., no estate tax liability arises by virtue of section 2035(b)). If, however, the donor dies within that three-year period, then the indemnity right will be equal to whatever the estate tax liability actually is. This is in contrast to the value petitioner estimates with mortality table calculations. Consequently, the donees either could get a windfall (i.e., getting a gift tax discount and not paying any estate tax) or may end up suffering some serious repercussions necessitated by finding consideration (i.e., potentially paying a lot more in estate tax than is in accord with the discount they received). This issue is not before us now, but we should recognize the issue we create in finding the present promise to pay contingent estate tax may be consideration to the donor.

LAUBER, *J.*, agrees with this concurring opinion.

―――――――

LAUBER, *J.*, concurring: I agree that the motion for summary judgment filed by respondent (IRS or respondent) should be denied, and I concur in the opinion of the Court. I write separately to express my views on two points.

As a condition of receiving the gifts at issue, the donor's four daughters assumed an obligation to pay any additional estate tax that might arise by virtue of the section 2035(b) "gross-up"—that is, the possibility that the gift taxes paid on their gifts would be included in the gross estate if the donor died within three years of making the gifts. I will refer to this contingent liability as an "obligation to pay the section 2035(b) tax." The IRS seeks summary judgment on the ground that the donees' assumption of an obligation to pay the section 2035(b) tax cannot, as a matter of law, constitute "consideration" received by the donor in exchange for the gifts. *See* sec. 2512(b). According to the IRS, therefore, the donees' assumption of this liability cannot be considered as

an offset in determining the value of the gifts for Federal gift tax purposes.[1]

In *McCord v. Commissioner*, 120 T.C. 358 (2003), *rev'd and remanded sub nom. Succession of McCord v. Commissioner*, 461 F.3d 614 (5th Cir. 2006), we resolved this issue in favor of the Commissioner, holding after a lengthy trial that the donees' assumption of an obligation to pay the section 2035(b) tax did not constitute "consideration" within the meaning of section 2512(b). We offered two rationales for this holding. First, we determined that "no recognized method exists for approximating the burden of the estate tax with a sufficient degree of certitude to be effective for Federal gift tax purposes." *McCord*, 120 T.C. at 402. We analogized the donees' assumption of an obligation to pay the section 2035(b) tax to the donor's contingent reversionary interest in *Robinette v. Helvering*, 318 U.S. 184, 188–189 (1943), which the Supreme Court deemed too speculative to be treated as an offset in determining the value of a gift. *See McCord*, 120 T.C. at 401 n.49, 403. Second, we cited "the 'estate depletion' theory of the gift tax" as additional support for our holding. *Id.* at 403 (citing *Commissioner v. Wemyss*, 324 U.S. 303, 307–308 (1945)). We reasoned that any value derived from the donees' satisfaction of their obligation to pay the section 2035(b) tax "would accrue to the benefit of the donor's estate (and the beneficiaries thereof) rather than the donor." *Id.* "The donor in that situation," we concluded, "might receive peace of mind, but that is not the type of tangible benefit required to invoke net gift principles." *Ibid.*

The Court's opinion discusses at length both rationales advanced in *McCord*—the "too speculative" theory and the "estate depletion" theory. The Court finds neither rationale persuasive and appears to overrule *McCord*, at least to the

---

[1] The IRS frames the question as whether the donees' assumption of an obligation to pay the section 2035(b) tax constitutes "adequate and full consideration in money or money's worth" within the meaning of section 2512(b). But if the donees' assumption of this liability represented "an adequate and full consideration," there would be no gift at all. Where, as here, the donor receives in exchange something less than "an adequate and full consideration," we are required to determine "the amount by which the value of the [gifted] property exceed[s] the value of the consideration" that the donor actually receives. Sec. 2512(b). I will refer to the latter as "consideration" or "return consideration."

extent it addresses the former. As explained more fully below, I agree that the IRS' motion for summary judgment should be denied, but I disagree with the Court's treatment of *McCord*.

A. *The "Too Speculative" Theory*

The argument respondent advances in support of his summary judgment motion is as follows: "The daughters' assumption of the section 2035(b) liability does not constitute * * * consideration * * * within the meaning of section 2512(b) because it does not increase the value of petitioner's taxable estate. *Commissioner v. Wemyss*, 324 U.S. 303, 307 (1945)." Absent from this argument is any contention that the daughters' assumption of the section 2035(b) tax is "too speculative" to be considered for Federal gift tax purposes. Indeed, in a footnote, respondent explicitly "reserves the issue of whether the donees' exposure to the executor is too speculative to quantify as a matter of law." "[A]ddressing the 'too speculative' issue," respondent assures us, "is not necessary" for purposes of ruling on his motion for summary judgment.

At the summary judgment stage of this case, the Court thus confronts a scenario in which neither party is asking us to consider, or reconsider, the "too speculative" rationale articulated in *McCord*. By "reserving" this issue, respondent has preserved the option of advancing this argument in his posttrial briefs, after all evidence in the case has been heard. Because respondent does not urge the "too speculative" theory in support of his motion for summary judgment, and because respondent may end up never advancing this theory at all, I believe that the Court's discussion of this point is premature.

Familiar principles of judicial restraint counsel that courts refrain from deciding complex questions until it is absolutely necessary to do so. That admonition applies with particular force where (as here) the consequence of a premature decision would be to overrule a binding precedent. Under the doctrine of stare decisis, this Court should be reluctant under any circumstances to overrule a binding precedent. When we face a motion for summary judgment in which the moving party explicitly disclaims reliance on the rationale embraced by that precedent, the force of stare decisis is quite compelling.

For these reasons, I believe that the Court's lengthy discussion of the "too speculative" theory is unnecessary at the summary judgment stage of this case. I also think it improper to consider overruling *McCord*, insofar as it embraces the "too speculative" theory, until a party has squarely presented this issue for resolution. There is no need to address either of these questions in order to dispose of respondent's pending motion for summary judgment. Both questions may appropriately be addressed, if necessary, in the posttrial opinion. [2]

## B. *The "Estate Depletion" Theory*

To the extent that respondent relies on *McCord* at all in support of his motion for summary judgment, it is for the second rationale articulated in *McCord*—namely, the "estate depletion" theory. Here, as in *McCord*, respondent contends that the donees' assumption of an obligation to pay the section 2035(b) tax "does not increase the value of petitioner's taxable estate." Because "an heir's agreement to pay the portion of the estate tax allocable to the property received by that heir does not affect the size of the taxable estate," that agreement, according to respondent, cannot constitute "consideration," as a matter of law, within the meaning of section 2512(b).

In *McCord v. Commissioner*, 120 T.C. at 403, we reasoned that the only value derived by the donor (as opposed to her estate) from the donees' promise was "peace of mind," and we held that this intangible benefit was insufficient to constitute "consideration" that could serve to offset the face value of the gifts. Here, respondent frames his "estate depletion" argument quite differently. In this case, respondent contends that the donees' agreement to pay the section 2035(b) tax does not increase the value of petitioner's taxable estate because that agreement operates merely as an "agreement to apportion the burden of the tax within the estate and, in effect, among the estate's beneficiaries." I will refer to this contention as respondent's "apportionment clause" argument.

---

[2] While I cannot join the Court's decision to overrule *McCord* at this stage of this case, I agree that the characterization of the valuation exercise as "too speculative or highly remote is a factual issue" properly resolved at trial, should respondent ultimately advance this contention. *See* op. Ct. p. 272.

The Court properly refrains from granting summary judgment to respondent on the "estate depletion" issue. In the course of its opinion, however, the Court does not mention respondent's "apportionment clause" argument. Because respondent's "estate depletion" and "apportionment clause" arguments are closely intertwined, the Court's opinion warrants clarification.

According to respondent, the estate tax ultimately due from petitioner's estate, and the assets out of which that tax will be paid, will be exactly the same regardless of the donees' agreement to pay the section 2035(b) tax. The only effect of that agreement is that a portion of the estate tax—namely, the portion attributable to any section 2035(b) inclusion—will be paid by the donees rather than by the executor. But if the daughters receiving the inter vivos gifts are also beneficiaries of petitioner's estate, they will bear the economic burden of the estate tax either way. They will pay the section 2035(b) portion of the tax under the agreement or, absent the agreement, they will receive a proportionately smaller inheritance because the section 2035(b) portion of the tax will have been paid by the executor. In neither case is the estate "replenished."

Respondent bolsters his "estate depletion" theory by reference to New York trust and estate law. According to respondent, New York statutory law would apportion the Federal estate tax attributable to the section 2035(b) gross-up to the persons benefited by the gifts, and the statute would require those persons to pay that portion of the estate tax. The daughters' assumption of the obligation to pay the section 2035(b) tax, in respondent's view, simply memorializes an obligation they would have anyway under New York law. If that is true, their contractual assumption of this obligation arguably confers no benefit on the donor or her estate—respondent calls it "a worthless piece of paper," and hence it does not constitute "consideration" to either of them. Stated differently, a "willing buyer" of the gifted assets would not regard as a negative the condition that she assume contingent liability for the section 2035(b) tax if she already bore contingent liability for the section 2035(b) tax under New York law. Rather, a "willing buyer" would agree to pay face value for the gifted assets, unreduced by the notional

"encumbrance" represented by the contingent section 2035(b) liability.

Petitioner responds to respondent's "apportionment clause" argument on several levels. Petitioner points out, correctly, that "[t]he Commissioner's argument is grounded in his assumption that the [d]aughters are the beneficiaries of Mrs. Steinberg's estate." According to petitioner, this assumption "is not supported by any evidence in the record and is entirely speculative," since "the beneficiaries of Mrs. Steinberg's estate will not be known until she dies and there is an estate." If the daughters *are* beneficiaries of Mrs. Steinberg's estate, petitioner seems to acknowledge that the apportionment provisions of New York law would impose on them the same obligation to pay the section 2035(b) tax that they assumed contractually in the net gift agreement. But petitioner contends that the donees' contractual assumption of this liability nevertheless benefits the estate because the net gift agreement "provides an effective enforcement mechanism that does not exist under the [New York] statute."

I agree that respondent's motion for summary judgment should be denied because the proper disposition of his "apportionment clause" argument hinges on resolution of disputed issues of material fact. *See* op. Ct. p. 283. These facts may include the following: (1) whether petitioner's daughters, at the time of the gifts, were beneficiaries under her will; (2) whether petitioner's daughters, if not then beneficiaries under her will, should be regarded as such because they were the natural objects of her affection and bounty; (3) whether petitioner, a New York resident when she made the gifts, should be deemed a New York domiciliary for purposes of applying the New York apportionment statute; (4) whether the net gift agreement, as petitioner contends, "provides an effective enforcement mechanism that does not exist under the [New York] statute"; (5) whether the bulk of petitioner's assets will be subject to probate or will pass by trust or other nonprobate mechanism, which might affect ease of enforcement; and (6) whether any incremental enforcement benefit is substantial enough to constitute "consideration" within the meaning of section 2512(b).

The Court appears to recognize that respondent, while not entitled to summary judgment on his "estate depletion" theory, could prevail on this theory at trial if the requisite

facts are resolved in his favor. Indeed, the proper disposition at trial of respondent's "apportionment clause" argument may determine not only whether the donees' agreement to pay the section 2035(b) tax constitutes "consideration," but also the nature and outcome of the valuation exercise. If the only benefit accruing to petitioner and her estate from the donees' agreement to pay the section 2035(b) tax is the incremental benefit the executor derives from having a contractual as well as a statutory enforcement mechanism against the daughters, the actuarial value of their assumption of the contingent section 2035(b) liability becomes essentially irrelevant. The thing to be valued in that event—the "consideration" received by petitioner's estate—will be this incremental enforcement capacity enjoyed by the executor. As Judge Raum noted 50 years ago, we should be cautious in treating as statutory "consideration" obligations assumed in "an intrafamily transaction" under "'colorable family contracts.'" *Estate of Woody v. Commissioner*, 36 T.C. 900, 903 (1961) (quoting *Carney v. Benz*, 90 F.2d 747, 749 (1st Cir. 1937)). Assuming arguendo that the actuarial value of the daughters' assumption of the contingent section 2035(b) liability is $5,838,540, as petitioner contends, the value of the incremental enforcement capacity enjoyed by the executor may be substantially less than that.

In sum, the Court properly leaves the evaluation and disposition of respondent's "apportionment clause" argument for a posttrial opinion after all the evidence in this case has been heard. Respondent's motion for summary judgment should be denied, not because his "estate depletion" theory is wrong, but because the proper resolution of the "apportionment clause" argument underlying his "estate depletion" theory hinges on disputed issues of material fact. Because respondent could ultimately prevail on his "estate depletion" theory if the trial establishes the requisite facts in his favor, it would clearly be premature to overrule this aspect of *McCord* at the present stage of this case. That is a question for another day.

GALE, GOEKE, KROUPA, GUSTAFSON, and MORRISON, *JJ.*, agree with this concurring opinion.

HALPERN, *J*., dissenting:

## I. *Introduction*

Respondent has moved for summary adjudication that, in computing the amount of a gift, a donee's promise to pay the additional Federal and State estate taxes that might arise by virtue of the application of section 2035(b) does not constitute adequate and full consideration in money or money's worth within the meaning of section 2512(b). As respondent makes clear in replying to petitioner's response to his motion: "Respondent is challenging the *nature* of the consideration in this motion, * * * not the fair market value of that consideration". Because it is only the nature of the consideration that respondent is challenging, I agree with Judge Lauber that the discussion of the "too speculative" theory is unnecessary at this stage of this case. I further agree with him that it is at this time improper to consider overruling *McCord v. Commissioner*, 120 T.C. 358 (2003), *rev'd and remanded sub nom. Succession of McCord v. Commissioner*, 461 F.3d 614 (5th Cir. 2006), insofar as it embraces that theory. I do believe that we should grant respondent's motion on the ground that allowing a reduction of an otherwise taxable transfer by an actuarial estimate of the value of the estate tax that might result because of the application of section 2035(b) is inconsistent with Congress' purpose in enacting section 2035(b).

## II. *Some Background*

Congress enacted the predecessor of section 2035(b) to mitigate in part a disparity between the tax bases subject to the gift tax and the estate tax, respectively. The gift tax base is "tax exclusive", while the estate tax base is "tax inclusive". Thus, assume a wealth transfer tax system that, from the first dollar, taxes all gratuitous transfers of wealth at a single rate, say 45%. Under such a system, the $15 million taxable estate of a decedent (let's call her "mother") will bear a tax of $6,750,000, which will leave $8,250,000 to distribute to the decedent's heir (daughter). The tax base against which the hypothetical 45% flat-rate estate tax is applied is inclusive of the tax to be paid, so that the whole of mother's taxable estate, whether going to daughter or going to the tax

collector, is subject to that 45% flat-rate estate tax. On the other hand, if, before she died, mother decided to rid herself of her $15 million by making a gift to daughter, she could, from $15 million, make a gift of $10,344,828, paying a gift tax of $4,655,172. Daughter would receive $2,094,828 more, and the tax collector would receive an equal amount less, than either would receive were mother to let the $15 million pass through her estate to daughter. The reason for the difference in result is that the gift tax base *excludes* the tax to be paid, so that only the amount of the gift is taxed, while the estate tax base *includes* the amount of tax to be paid. Congress was fully aware of the disparity in the transfer tax bases applicable for the gift tax and the estate tax when it enacted the predecessor of section 2035(b). *See* H.R. Rept. No. 94–1380, at 11–12 (1976), 1976–3 C.B. (Vol. 3) 735, 745–746. It chose to mitigate that disparity only with respect to gifts made within three years of death. *Id.* The mitigation mechanism is the so-called section 2035(b) gross-up rule, by which any gift tax paid on gifts made within three years before death is added to the gross estate. The report of the Committee on Ways and Means puts it this way: "This 'gross-up' rule will eliminate any incentive to make deathbed tranfers [sic] to remove an amount equal to the gift taxes from the transfer tax base." H.R. Rept. No. 94–1380, *supra* at 12, 1976–3 C.B. (Vol. 3) at 746.

The section 2035(b) gross-up rule accomplishes Congress' purpose by subjecting any gift made within the statutory period to taxation exactly as it would have been taxed had the transferred amount been part of the decedent's gross estate. Thus, assume that mother had opted for a lifetime transfer, paying $4,655,172 in gift tax and making a gift to daughter of $10,344,828. Assume further that mother dies within three years of making the gift. Section 2035(b) would include in her gross estate the $4,655,172 paid in gift tax, which, assuming that her taxable estate equaled her gross estate, would attract an estate tax of $2,094,828. The sum of the prior gift tax paid by mother, $4,655,172, and the current estate tax borne by her estate, $2,094,828, equals $6,750,000, which is exactly what it would have been had mother made no gift and died possessed of $15 million.[1] Moreover, dying

---

[1] The following table shows the gift tax and the equivalency between a

penniless (she either paid in tax or gave to daughter all of her $15 million), mother's estate would have no funds to bear the estate tax, which, pursuant to section 6324(a)(2), would be borne by daughter, who, in effect, would have to return $2,094,828, to the estate to pay the estate tax, reducing daughter's net benefit received from mother to $8,250,000, as shown *supra* note 1. That sum, $8,250,000, is exactly the sum that she would have received had mother made no life-time gifts and had she named daughter sole beneficiary of her estate. Of course, if mother survives her gifts by more than three years, the more lenient gift tax result prevails.

If mother opts for a lifetime transfer, she has two choices with respect to paying the resulting $4,655,172 gift tax: She can pay the tax herself, giving daughter a straight gift of $10,344,828, or she can make what the opinion of the Court describes as a net gift, giving daughter $15 million on the condition that daughter pay the $4,655,172 gift tax. Whether mother chooses to make a straight gift or she chooses to make a net gift, the amount of of the gift tax is the same, as is the amount of mother's gift to daughter. Put generally, the proposition is that, in the case of a donor with a given sum of pretax wealth out of which she would like to make the maximum gift, the calculation of the maximum gift and the determination of the resulting gift tax is the same whether the donor intends a straight gift or a net gift. The calculation need not be difficult. The donor with some gross amount, $G$, wishing to determine the net amount, $N$, that, after paying tax at rate $t$, will, along with the tax, add up to $G$, can express her problem as follows:

$$N + tN = G$$

This equation can be restated as:

---

lifetime gift subject to a sec. 2035(b) gross up and solely a testamentary transfer.

|  | Gift tax | Estate tax (no prior gifts) | Estate tax (sec. 2035(b) applies) |
|---|---|---|---|
| Wealth | $15,000,000 | $15,000,000 | $15,000,000 |
| Gift tax | 4,655,172 | --- | 4,655,172 |
| Estate tax | --- | 6,750,000 | 2,094,828 |
| Total transfer taxes | 4,655,172 | 6,750,000 | 6,750,000 |
| Wealth to donee/heir | 10,344,828 | 8,250,000 | 8,250,000 |

$N (1 + t) = G$

and restated again as: [2]

$N = G/(1 + t)$

Thus, setting $G$ equal to \$15 million, $N$ is \$10,344,828, and by subtracting $N$ from $G$, the gift tax is \$4,655,172. The procedure described is *solely* about determining *how much* one can give away under a tax-exclusive gift tax at rate $t$. It is also useful to illustrate that, at any positive tax rate, $t$, and for any gross amount, $G$, the amount that can be given by gift, $G/(1 + t)$, will always exceed the amount that can be transferred at death, $G (1 - t)$. [3]

III. *Donee's Agreement To Pay Section 2035(b) Liability*

Now let us suppose that mother, having opted for a lifetime transfer, transfers to daughter the whole \$15 million, obligating daughter to pay the resulting gift tax and, further, making her promise to pay the estate tax that will result on account of section 2035(b) if mother should die within three years of making the gift. Has the calculus of the gift and the resulting gift tax changed? Certainly not because of daughter's obligation to pay any gift tax, but what about because of her promise to pay any estate tax? An actuarial value can be assigned to that obligation. Petitioner's attorney and her appraiser have written an article setting forth a method for valuing a donee's obligation to pay the estate tax resulting from a section 2035(b) gross-up. Michael S. Arlein & William H. Frazier, "The Net, Net Gift", 147 Tr. & Est. (Arlein & Frazier) 25 (2008). They assume an 85-year-old donor, transferring \$15 million to her son, the donee, on December 31, 2007, who, in addition to agreeing to pay the gift tax, agrees to pay any estate tax resulting from any section 2035(b) gross-up. They call the arrangement a net, net gift.

_____

[2] The procedure is elaborated on in Rev. Rul. 75–72, 1975–1 C.B. 310.

[3] The amount that can be given by gift, $G/(1 + t)$, will always exceed the amount that can be transferred at death, $G (1 - t)$, since:

$$G/(1 + t) > G (1 - t) \iff 1 > 1 - t^2$$

Calculating an estate tax of $2,214,990, and taking into account mortality and present value factors, they assign a value of $700,515 to the donee's obligation to pay the estate tax. Dividing $700,515 by $2,214,990, I calculate a discount factor of 31.63%, which, for convenience, I will adopt for my calculations.

So, if the net, net gift form is respected, the net amount of mother's lifetime transfer to daughter would be calculated by subtracting from the $15 million the actuarial value of daughter's obligation to pay the estate tax liability resulting from a section 2035(b) gross-up. The calculation of the potential section 2035(b) liability is somewhat complex, because it is dependent on the amount of the gift tax (which determines the potential section 2035(b) liability), which, in turn, is dependent on the actuarial value of daughter's obligation to pay that liability. A good idea of how the relevant calculations are done can be obtained from Arlein & Frazier, *supra*, at 31 ("Valuing the IRC Section 2035(b) Liability"). If the net, net gift form is respected, I calculate that, on the transfer of $15 million to daughter (subject to her obligation to pay any resulting section 2035(b) liability), the resulting net, net gift and net, net gift tax would be $9,907,198 and $4,458,239, respectively. The section 2035(b) gross-up amount would be $4,458,239 (the gift tax paid), giving rise to $2,006,208 of potential estate tax. Taking 31.63% of that amount results in an actuarial value of $634,563 for daughter's obligation to pay that tax. The gift tax savings from the net, net gift would be $196,933. [4] If mother should die within three years of making the gift, the estate tax savings would

---

[4] The following table compares a gift (or a net gift) to a net, net gift.

|  | *Gift tax* | *Net, net gift tax* | *Difference* |
|---|---|---|---|
| Wealth | $15,000,000 | $15,000,000 | --- |
| Sec. 2035(b) obligation | --- | 634,563 | --- |
| Net transfer | 15,000,000 | 14,365,437 | --- |
| Gift  tax | 4,655,172 | 4,458,239 | [1]$196,933 |
| Gift | 10,344,828 | 9,907,198 | --- |
| Wealth  to  donee/heir | 10,344,828 | 10,541,761 | [2] −196,933 |

[1]Reduction in the amount of the gift tax.

[2]Increase in the amount of wealth to donee/heir.

be $88,620.[5] The total transfer tax savings should she die within three years would be $285,553.[6]

Those savings seem fundamentally at odds with Congress' purpose in enacting section 2035(b); i.e., to eliminate incentives to make deathbed transfers. Daughter's agreement to pay the estate tax resulting from a section 2035(b) gross-up is different in kind from her agreement to pay the gift tax. The latter obligation is a definite, fixed obligation to pay a tax that is presently due. When mother gives to daughter both a gift and the money to pay the gift tax, the economic and tax consequences are no different than had mother held on to the tax money and paid the tax herself. Moreover, *whether mother or daughter pays the gift tax has nothing whatsoever to do with the amount of the gift*! Daughter's obligation to pay the estate tax is something else entirely. It is *not* an obligation to pay a tax that is presently due. Indeed, it is an obligation to pay an estate tax liability that *might or might not* eventually come due. It is, in essence, daughter's promise to return to mother's estate that portion of a gift that must be paid to the tax collector if it turns out that the gift was, in effect, mistakenly subject to the lenient (tax-exclusive) gift tax rules when it should have been subject to the stricter

[5] The following table compares the estate tax for a straight gift (or a net gift) to the estate tax for a net, net gift.

|  | Estate tax (sec. 2035(b) applies) | Net, net estate tax (sec. 2035(b) applies) | Difference |
|---|---|---|---|
| Sec. 2035(b) gross-up | $4,655,172 | $4,458,239 | --- |
| Estate tax | 2,094,828 | 2,006,208 | [1]$88,620 |

[1]Reduction in amount of estate tax.

[6] The following table compares the total transfer taxes for a straight gift (or a net gift) to the total transfer taxes for a net, net gift.

|  | Estate tax (sec. 2035(b) applies) | Net, net estate tax (sec. 2035(b) applies) | Difference |
|---|---|---|---|
| Wealth | $15,000,000 | $15,000,000 | --- |
| Estate tax | 2,094,828 | 2,006,208 | $88,620 |
| Gift tax | 4,655,172 | 4,458,239 | 196,933 |
| Total transfer taxes | 6,750,000 | 6,464,447 | [1]285,553 |
| Wealth to donee/heir | 8,250,000 | 8,535,553 | [2]–285,553 |

[1]Transfer tax savings.

[2]Increase in the amount of wealth to donee/heir.

(tax-inclusive) estate tax rules. If daughter has to return a portion of the gift to mother's estate in order to pay the estate tax, both daughter and the estate are in exactly the same positions with respect to the sum of gift tax and the estate tax in which they would be had mother died with an estate equal to the sum of the gift and the gift tax paid, which estate she had left entirely to daughter. [7]

If the estate tax due from mother's estate on a taxable estate of $15 million left to daughter is $6,750,000, [8] a lifetime transfer of $15 million to daughter subject to her obligation to pay the gift tax and any estate tax resulting from a section 2035(b) gross-up should, if section 2035(b) is serving its purpose, produce a gift tax that, when added to the estate's potential section 2035(b) liability, equals $6,750,000. As the calculations above illustrate, that will not be so if the net, net gift form is respected. [9] Congress enacted section 2035(b) to impose estate taxation on more leniently taxed lifetime gifts when the transferor dies within three years of making the gift. Allowing the transferor to assimilate the potential section 2035(b) liability into the net-gift rubric allows the transferor to render *more lenient* the gift taxation (if no section 2035(b) liability arises) *and* the estate taxation (assuming that it does arise) of the transfer. That seems an obvious subversion of Congress' purpose in enacting section 2035(b).

Indeed, allowing the donor of a gift to reduce an otherwise taxable transfer by an actuarial estimate of the estate tax resulting from a section 2035(b) gross-up that may never occur has the perverse effect of *incentivizing* deathbed transfers. If mother believes that she has only months to live, then

[7] Indeed, petitioner's attorney and her appraiser in their article state:

It's important to note that under most circumstances the donee's assumption of the IRC Section 2035(b) liability does not actually increase the donee's tax exposure. If the donee is the residuary beneficiary of the donor's estate and the donor's will directs that all estate taxes be paid out of the residue, the Section 2035(b) liability would be borne by [the] donee regardless of his assumption of the liability pursuant to the net gift agreement. Likewise, in the absence of a direction under the donor's will, most state tax apportionment statutes would allocate the Section 2035(b) liability to the donee. [Michael S. Arlein & William H. Frazier, "The Net, Net Gift", 147 Tr. & Est. 25, 33 (2008); fn. ref. omitted.]

[8] *See supra* note 1.
[9] *See supra* note 6.

if section 2035(b) is working as Congress intended, the imminence of death (and the resulting estate tax) should *not* be an incentive for her to make a deathbed transfer, since the transfer tax burden on $15 million should be the same whether she immediately gives $15 million to daughter or lets it pass through her estate. If, on the other hand, making a net, net gift to daughter will reduce both the gift tax and, if she should die as expected, the resulting estate tax, then there *is* an incentive to make a deathbed transfer. That cannot be what Congress intended when it enacted section 2035(b).

Nor should the conclusion change if mother had wealth in excess of $15 million that formed part of her taxable estate and that would have borne part of the section 2035(b) liability had daughter not agreed to bear that liability pursuant to the net, net gift arrangement. If mother's wealth exceeded $15 million, the transfer tax savings to the estate on account of the net, net gift arrangement would be the same; only the incidence of the reduced estate tax would shift from someone else to daughter.

IV. *Conclusion*

If it succeeds, the net, net gift arrangement certainly reduces the gift tax attendant to a fixed dollar transfer, and, if the donor dies within the prescribed period, it also reduces the estate tax resulting from a section 2035(b) gross-up. I find it hard to believe that in enacting the predecessor of section 2035(b) to disincentivize deathbed gifts, Congress intended not only to encourage a contrary result but also to allow all gift-givers to bootstrap themselves into a better position with respect to the gift tax than they would be in if no section 2035(b) liability ever has to be paid.